**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **AARON COOPER,** | ) | |
| **WILLIE HARVEY,** | ) | |
| **AND,** | ) | |
| **ORLANDO HILL** | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Case No. ______________** |
| **vs.** | ) | |
| | ) | **COMPLAINT** |
| **KIRBY INLAND MARINE, LP,** | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

Plaintiffs Aaron Cooper, Willie Harvey, and Orlando Hill, by and through their undersigned counsel, complain as follows:

## I. NATURE OF THE CLAIMS

1. Plaintiff Aaron Cooper, Willie Harvey and Orlando Hill bring claims for racial discrimination, harassment/hostile work environment and retaliation pursuant to 42 U.S.C. Sec. 1981.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. Sec. 1331 and 1343.

3. Venue is proper in this District pursuant to the general venue provision, 28 U.S.C §1391 because Defendant can be found there; the River Operations Center, the division for which

Plaintiffs worked, is located in Baton Rouge, Louisiana; the land-based staff primarily overseeing Plaintiffs, including human resources representatives, port captains, and dispatchers, are located in Baton Rouge, Louisiana; many towboats staffed by Plaintiffs originated in Baton Rouge, Louisiana; and conduct complained of herein took place in part within the District of Louisiana.

## III. PLAINTIFFS

4. Plaintiff Aaron Cooper was employed by Kirby Inland Marine, LP from May 2012 to August 2016, initially as a deckhand, and later, as a tankerman. Plaintiff is a resident of Arkansas. He is an African American male.

5. Plaintiff Willie Harvey was employed by Kirby Inland Marine, LP from August 2007 to Summer of 2013, initially as a deckhand, and later, as a tankerman. Plaintiff Harvey is a resident of Florida. He is an African American male.

6. Plaintiff Orlando Hill has been employed at Kirby Inland Marine, LP from 2005 to the present. He began at Kirby Inland Marine, LP as a deckhand, continued as a tankerman, and is currently a deckineer. Plaintiff is a resident of Monroe, Louisiana.

7. Plaintiffs had a contractual relationship within the meaning of 42 U.S.C. Sec. 1981, with Kirby Inland Marine, LP.

## IV. DEFENDANT

8. Defendant Kirby Inland Marine, LP is a Delaware partnership and a wholly owned subsidiary of Kirby Corporation, a publicly traded company.

9. It is the nation's largest inland barge and tug boat operator, employing over 1500 employees and specializing in the transport of liquid cargo, including petrochemicals, petroleum

products and agricultural chemicals.

10. Kirby Inland Marine, LP is subdivided into multiple divisions. The River Operations Center, the division for which Plaintiffs worked, is located in Baton Rouge, LA, and is a primary point of contact for tugboats and inland barges transporting materials across the Mississippi river, the Ohio River, and other waterways.

## V. Factual Allegations

### DEFENDANT'S ORGANIZATIONAL STRUCTURE

<table>
<tr><th colspan="2">Upper Management</th></tr>
<tr><td colspan="2">William Ivey<br>President Marine Transportation Group, Kirby Inland Marine, LP<br>|<br>James Guidry<br>Executive Vice President of Vessel Operations, Kirby Inland Marine, LP<br>|<br>Lester Parker<br>Vice President of River Vessel Operations, Kirby Inland Marine, LP<br>|</td></tr>
<tr><th colspan="2">Management within a boat:</th></tr>
<tr><td colspan="2">|<br>Captain (1 per boat)<br>|<br>Relief Captain<br>|</td></tr>
<tr><th colspan="2">Non-management within a boat:</th></tr>
<tr><td>|<br>Pilot (supervisory position over crew)<br>|<br>Steersman<br>|<br>Captain's Mate (supervises tankerman and deckhands)<br>|</td><td>Chief Engineer (supervisory position; 2nd in Command)<br>|<br>Engineer<br>|<br>Deckineer</td></tr>
</table>

| | |
|---|---|
| Tankerman<br>\|<br>Deckhand | |

11. William Ivey is the president of Kirby Inland Marine, LP, (hereinafter Kirby) and has occupied the position since April 2011. James Guidry has served as Kirby's executive vice president of vessel operations since 2014. Lester Parker is Kirby's vice president of river vessel operations, and has been in the position since approximately 2011.

12. Kirby Inland Marine, LP operates over 220 active tow boats that transport oftentimes toxic and combustible liquid cargo. A majority of its non-managerial employees serve on water vessels.

13. The River Operations Center, the division for which Plaintiffs worked, assigns crews of 7 to 15 workers to each towboat, organized into relatively structured hierarchies.

14. At the top of the crew are captains and relief captains. Captains are responsible for supervising a crew and have ultimate authority over a vessel. Relief captains serve as captains in the captains' absence. Few African Americans relative to the total number of African Americans employed at Kirby have occupied a captain or relief captain position.

15. Non-managerial positions reporting to the captain include pilots, steersmen, tankermen, deckhands, chief engineers, engineers, and deckineers. When a towboat is short-staffed not all positions may be filled.

16. Pilots are responsible for navigating a boat and maintaining its course. They have the authority to supervise crew members, giving them orders and delegating tasks to them. Few African Americans have occupied a pilot position.

17. A steersman is a pilot-in-training. Steersmen assist pilots with piloting duties while continuing to perform deckhand duties. Few African-Americans have occupied a steersman position.

18. Captain's mates supervise deckhands and tankermen, communicating the captain's orders to deckhands and tankermen and ensuring that the captain's orders are followed.

19. Tankermen are responsible for monitoring the transfer of liquid cargo from dock to barge and barge to dock, in addition to performing deckhand duties.

20. Deckhands are entry level positions. They are responsible for maintenance of the boat, cargo handling and securing a boat at harbor.

21. A deckineer is an entry level engineer position. A deckineer's job duties include assisting the engineer with engineering duties and also performing tankerman duties.

22. An engineer's job duties include repairing and maintaining the engines, generators, and other boat equipment.

23. A chief engineer has the ultimate responsibility for the condition of a boat's engines, generators, and other boat equipment. He is considered second-in-command on a boat.

**a. Discrimination in Training and Promotion**

24. Kirby recruits at all levels of experience, with a large number of workers having no experience at hire. It offers training opportunities to enable workers to progress from deckhands up to captain.

25. On-the-job training is available for most positions at the discretion of the captain. For example, a tankerman may train a deckhand in tankerman duties; an engineer may train a potential deckineer on deckineering duties; a pilot may train a potential steersman on steersman

duties. Permission to train is at the discretion of a boat's captain.

26. Plaintiff Aaron Cooper sought training as a deckineer around March 2015; though a position was available on his boat, the *Pass Christian*, and he had fulfilled the minimum requirements for time on-board a boat, the captain of the boat did not approve him for training; without the opportunity to train, Plaintiff was unable to procure a promotion to deckineer.

27. Cooper was not the only African-American employee to be deprived of promotional opportunities. For example, Plaintiff Willie Harvey sought training as a steersman on multiple occasions, including from Harold Driven, the Captain of the *Kimberley Jane* in or around 2010, and from John Fair, Captain of the *Daytona* in or around 2008. Although he had fulfilled the minimum requirements for time on board a boat, he was not offered the training, and was unable to procure a promotion to steersman.

**b. Discriminatory Work Environment**

28. Plaintiff Orlando Hill began working at Kirby in 2005 as a deckhand. He became a tankerman in 2007, and a deckineer in 2013. He is presently employed at Kirby.

29. Plaintiff Willie Harvey began working at Kirby in 2007 as a deckhand, became a tankerman in January 2009, and separated from Kirby in 2013.

30. Plaintiff Aaron Cooper began working at Kirby in 2012 as a deckhand, became a tankerman in 2014, and separated from Kirby in August 2016.

31. Throughout Plaintiffs' employment, Defendant regularly exposed Plaintiffs Hill, Cooper and Harvey to racially harassing language and treated them in a racially discriminatory manner throughout their employment at Kirby. Captains, relief captains, and chief engineers at the top of a towboat's managerial hierarchy openly used the “N”word, wore confederate flag t-shirts,

opined on the inferiority of African Americans, stereotyped African Americans as freeloaders and crack-heads, and engaged in other similar racially harassing conduct. Crews were captive audiences to management's offensive conduct.

32. Captains, relief captains, and chief engineers did not hide their animosity towards African-Americans employed at Kirby. For example, in or around 2010, Chief Engineer McGee opined that "every time a black guy is hired, a more qualified white person is overlooked." Captain Herman Tyler, in or around 2011, voiced his preference for a "white only boat." In or around 2013, when a dispatcher indicated to Captain Meeks that he would be receiving a new hire on his boat, he asked whether the individual was black or white.

33. The race-based hostility was common knowledge among all levels of employees at Kirby. For example, within days of Plaintiff Harvey's hiring Tankerman Ryan Polk acknowledged to him that "black guys don't last." To Plaintiff Hill, Ashley Ethridge, a white coworker, confided that he hated spending time with Relief Captain Meeks because of his racially offensive language.

34. Plaintiffs Hill, Harvey, and Cooper worked together on the *City of Louisville*. Plaintiff Hill was assigned to the boat from the start of his employment in approximately 2005 to 2014; Plaintiff Cooper was also assigned to the boat from almost the start of his employment in 2012 to 2014; Plaintiff Harvey was assigned to the boat from approximately 2011 to 2013.

35. Prior to his assignment on the *City of Louisville*, on which he joined Plaintiff Hill and Plaintiff Cooper, Plaintiff Harvey was assigned to a number of boats, including the *Archie Wilson*, the *Daytona*, the *Robert G Stone*, the *Kimberly Jane* and the *City of New Orleans*.

36. Plaintiff Harvey was subjected to ongoing racial harassment and discrimination

throughout his employment, including on the boats he worked on prior to joining the crew of *City of Louisville*.

37. The first towboat to which Plaintiff Harvey was assigned was the *Archie Wilson*, in August 2007, for approximately a day or two. Preparing to board the boat in Baton Rouge, he was joined by Ryan Polk, a tankerman, who wore a Confederate flag bandanna. Polk remarked to Plaintiff that “Black guys don't last.” He indicated that “everyone at Kirby is a biker and they don't like black guys.”

38. Reserving judgment on the company that he had just been hired by, and hoping to avoid further confrontation, Plaintiff Harvey sought to distance himself from Polk. However, Polk continued to harass Plaintiff, badgering him with denigrating comments and still openly wearing his Confederate flag bandanna.

39. Plaintiff Harvey complained to Captain Pope that he didn't want to work with Polk because he was making racially offensive comments, including telling Plaintiff that everyone at Kirby did not like black people. The Captain responded, “that doesn't sound like Polk,” failing to credit Plaintiff's complaint. Kirby transferred Plaintiff off the boat following his complaint.

40. Defendant then assigned Plaintiff Harvey to the *Daytona*, from approximately 2007 to 2008, where he continued to be racially harassed. The relief captain, William Baptiste, often voiced his beliefs that black people were cursed by God.

41. Richie Carroway a tankerman, freely used the racial slur “jigaboo,” and even after Plaintiff Harvey told him to stop.

42. Plaintiff Harvey was the victim of offensive racial stereotypes. For example, when a white coworker overdosed on drugs, individuals from Kirby's Corporate office and Kirby's

lawyers questioned Harvey repeatedly about whether he had supplied drugs, despite that Harvey had no involvement and no connection with the incident. Eventually, Kirby's lawyers found money and a baggie of drugs in a white deckhand's room.

43. When Plaintiff Harvey requested training to assist him in passing the tankerman's practical exam, “Smitty,” the tankerman assigned to train Plaintiff Harvey, failed to do so, instead training a white deckhand who came aboard the towboat after Plaintiff. Harvey was only able to learn tankerman duties by observing the training given to the white deckhand.

44. For the short period of time Plaintiff Harvey was on the *Robert G. Stone*, in November 2008, he also heard racially offensive comments. On one occasion, typical of the scenarios Plaintiff Harvey encountered on the boat, *The Jefferson's* theme song, “Moving on up,” was playing over the boat's intercom. Sam Turner, the Relief Captain, called out to the crew that President Obama was going to change the national anthem to “moving on up.” Offended, Plaintiff Harvey responded, “well he's your president too so it's your national anthem now too.”

45. Even after Plaintiff Harvey voiced his disapproval of Turner's offensive comments, Turner persisted in his racially insensitive remarks. For example, he made derogatory remarks about Michelle Obama's appearance, saying she looked like a man, and approached Plaintiff Harvey with race-based stereotypes, commenting that African-Americans were natural athletes, and implying white superiority in other areas.

46. Plaintiff Harvey continued to hear similar remarks on the *Kimberly Jane* from approximately 2010 until he was transferred to the *New Orleans*. Harold McGee, the boat's chief engineer, made racially offensive comments to Plaintiff on a daily basis. He referred to African-Americans as “colored”, and regularly denigrated African-American men saying for example

that, “every black guy I know is a player,” “I don't know why black guys are out here selling drugs,” “black guys cheat on their wives,” and “black guys abuse their women.”

47. At one point, McGee opined that Kirby had hired too many African Americans and stated that he did not think it was right “because every time a black guy is hired, a more qualified white person is overlooked.” When Plaintiff Harvey responded that “you are assuming that a more qualified white worker applied,” McGee became upset with Plaintiff.

48. The two captains Plaintiff Harvey worked under on the *Kimberly Jane* were also racially biased. The first captain, Harold Driven, regularly assigned a disproportionate share of work to Plaintiff over his white tankerman coworker, Patrick Hamilton. Though both tankermen were responsible for completing the task list assigned to tankermen, Plaintiff's white coworker regularly shirked his tasks without reprimand and the Captain required Plaintiff to pick up his coworker's slack.

49. The second Captain under whom Plaintiff worked, Captain Hindon, had a history of engaging in racially harassing slurs. It was common knowledge that Captain Hindon had called another crew member the N word and had gotten into a fight on another boat because of the use of the racial slur.

50. In addition to his history of race-based harassment, Captain Hindon was a reckless driver. He constantly ignored traffic control's directions to wait for other ships. On his first watch, i.e. his first shift on the boat, Captain Hindon ran into a lockwall, a dam-related structure. On another occasion, he nearly collided with a container ship eight times bigger than the *Kimberley Jane*. On yet another occasion, a ship nearly ran the *Kimberley Jane* over in Corpus Christi, Texas.

51. Given the Captain's history of harassment and his reckless driving of the *Kimberly Jane*, Plaintiff and a number of other crew members sought to be transferred from the boat. Instead of receiving the transfer, Plaintiff was falsely written up for not wearing protective gear and the Port Captain, the individual responsible for approving the transfer, stated that the transfer request could be construed as "*Harvey* being the problem." From the Port Captain's reaction, it became obvious to Plaintiff Harvey that Kirby would give every benefit of the doubt to its captains, even when captains endangered the lives of their crews and had a history of engaging in racial harassment.

52. Plaintiff eventually transferred onto the *City of New Orleans*, where he worked from approximately 2010 to 2011, and where he also continued to experience racially harassing and discriminatory treatment. The racial animosity of the boat's management became obvious to Plaintiff when he overheard Relief Captain Herman Tyler telling T.K., the chief engineer, that"[he was] going to make the boat a white only boat." In response, to Tyler's hateful statement T.K. laughed.

53. A typical example of the type of harassment Plaintiff experienced was Captain John Roban confusing Plaintiff Harvey for the one other African-American crew member on the boat, Renual Green. Captain Roban remarked to Plaintiff, "how many times have I told you that you can't stop working until the end of your shift," when he had never reprimanded Plaintiff Harvey for failing to work until the end of his shift. Plaintiff responded that the Captain was confusing him for Renaul Green because they were both African-American.

54. From the moment he became eligible for steersman training, Plaintiff regularly asked the various captains of his towboats for training to be able to successfully obtain a pilot's license,

including Captain Driven and Captain John Fair. His inquiries were ignored; instead he observed white trainees with less experience and boat-time than he had receive the training, including his white coworker, Longhorn. From Relief Captain Tyler's open assertion to T.K. about a "white" boat, and observing the dearth of African-American pilots, captains, and relief captains at Kirby, Plaintiff Harvey understood that Kirby preferred not to promote African-Americans to top positions within a boat.

55. In or around 2011, Plaintiff Harvey was transferred to the *City of Louisville*, joining Plaintiff Hill who had been assigned to the *City of Louisville* since 2005. Within a year of Plaintiff Harvey's arrival Plaintiff Cooper also joined the *City of Louisville*.

56. In 2005, when Plaintiff Hill was initially assigned to the *City of Louisville,* it was captained by Captain Slaydon and piloted by David Meeks.

57. In or around 2009, Meeks was promoted to relief captain and in or around 2013, he was promoted to captain.

58. Meeks subjected Plaintiffs Hill, Harvey and Cooper to unrelenting racial harassment. On a daily basis, he made racially offensive comments. He often wore Confederate flag t-shirts and liberally incorporated the N-word into his remarks, giving himself permission to use the N-word by claiming he had a black friend who "let" him use it.

59. Frequently, he called African-American women "crackheads" and stated that they sold their body for drugs. He often boasted that he had a black girlfriend and black stripper back in Houston.

60. Comments stereotyping African-Americans and the food African-Americans allegedly eat were a staple of Meeks' conversations. He would "joke," for example, "how do you know if a

black man had a good time at a party; when the ribs are gone," or "you know a black man had a good time at a party when the fried chicken is gone." He regularly referenced a 'black nanny,' often commenting that he did not drink Kool Aid because he drank "a lot of that growing up because [he] had a black nanny," and that he did not drink "jungle juice" because of his black nanny.

61. Other crew members voiced their offense at hearing Meeks' remarks, but Meeks continued undeterred. For example, Luke Borderline, an engineer, would complain to Meeks, "hey I don't play that," when Meeks made offensive racial comments; Meeks did not stop.

62. In 2008, Meeks was purchasing a new car and was not able to afford a Chrysler 300, a car that Plaintiff Hill owned. Finding out that Plaintiff owned the vehicle, Meeks began questioning Hill on how he could afford it, saying "you know you all have bad credit, you can't afford that."

63. His derogatory comment echoed past remarks he regularly made about African-Americans, including that African-Americans were on welfare, had bad credit, and lived on food stamps. For example, he regularly opined to Plaintiff Hill, "being a black man, ya'll can't live without welfare or foodstamps."

64. Around 2009, Plaintiff Hill was required to drive with Meeks for seven hours from Greenville, Mississippi to New Orleans to board a towboat. Through the duration of their drive, Meeks, in his typical fashion, kept up a racially derogatory commentary on those they passed. Spotting an elderly African-American lady mowing her lawn, Meeks commented, "she's mowing her lawn to supply her crack habit." When Meeks noticed an African-American lady and gentleman walking their dog, he commented, "look at those crack-heads." Encountering a young African American woman walking her two children, Meeks remarked, "she is probably going to

sell her kids for another hit."

65. Meeks' denigrating language intensified as the proportion of African-American crew members on *City of Louisville* increased between 2010-2012. By 2012, at least six African-American workers had become part of the *City of Louisville's* crew, including Plaintiff Harvey, Plaintiff Cooper, Plaintiff Hill, Rashard Perry, Chris Stoudamire, and James A.G. The African-American deckhands and tankermen comprised more than half of the boat's crew.

66. As more African Americans came aboard Meeks' boat, Meeks remarks turned uglier, conveying his belief in the inferiority of African-Americans.

67. For example, in front of the predominantly African-American crew, Meeks openly boasted that his family had owned slaves saying, "I was born with a silver spoon in my mouth, my grandfather owned a tow boat company and my family owned slaves." The Chief Engineer Harold McGee, William Barnard , a white deckhand, and other crew members were present for instances when Meeks restated this.

68. Meeks also often retold the incident of an African American worker's near drowning: When a crew-member attempted to throw the African-American worker a white cotton line, Meeks protested that the crew member should save the white coat line and "let the n*gger drown."

69. Plaintiff Hill, Plaintiff Cooper, Plaintiff Harvey, Chris Stoudemire, a African-American deckhand, and Loften all heard versions of this incident.

70. Also in his oft-repeated repertoire was an incident where both a black bumper tire and a "white guy" were overboard in the water. When Meeks pulled out the tire from the water first, the "white guy" remarked "I see you going to pull the black tire out before you pull the white

guy out."

71. On an almost daily basis, Meeks ranted about President Obama, remarking for example, that "he resembled a monkey," "Michelle Obama looked like a man," and "black people voted for him because he's black."

72. Typical comments Plaintiffs overheard on the *City of Louisville* included remarks comparing African-Americans to feces, and other dehumanizing statements.

73. For example, around March 2013, when Plaintiff Cooper was cleaning the boat, Meeks approached Cooper and remarked, "the boat was pretty dirty, a lot of black shit, almost as black as you."

74. Similarly, when Pilot Lewis Newlon nearly knocked Stoudemire overboard, he remarked, "you would have been a black swirl flushed down the river," comparing him to feces in a toilet.

75. On another occasion, when Plaintiff Harvey, Plaintiff Cooper, and Rashard Perry were rushing into the galley from the rain, Meeks remarked, "I seen all these black guys and I thought it was a penitentiary or something."

76. Chief Engineer McGee, with whom Plaintiff Harvey had prior encounters on the *Kimberley Jane,* regularly referred to African-Americans as "colored," and denigrated African-Americans as he had on the *Kimberley Jane*. *Supra.* ¶ 41.

77. Meeks also continued to use the N-word often. On one occasion, between shift changes, Meeks began narrating an incident to Plaintiff Cooper, Plaintiff Hill, Plaintiff Harvey, Stoudemire, and another African-American coworker; he proceeded to use the N-word almost 20 to 50 times over the course of the conversation.

78. Disgusted and overwhelmed, Plaintiff Harvey told him to stop using the N-word. Meeks deflected Plaintiff Harvey saying that “[he was] just telling a story.” Plaintiff Harvey repeated that Meeks should just stop.

79. Despite Plaintiff Harvey's clear remonstration against Meeks' language, Meeks continued, as he had after others' protests at his language, including Luke Borderline who would say “I don't play that,” Chief Engineer McGee, who would tell Meeks “you're going to get in trouble one day,” Plaintiff Hill who would often shake his head at Meeks' comments, Plaintiff Cooper who would become so upset he would leave the area where Meeks was.

80. Even while acknowledging the offensiveness of his comments, Meeks often made light of them by saying that “when [he] tells a joke about black people to white people, white people stop and look to see what the black person is going to say and if the black person laughs then everybody starts laughing.”

81. On another occasion, Meeks asked Plaintiff Hill if he knew whether a newly arriving deckhand was black or white. Meeks proceeded to speculate “that the name [Chad] sounds black.” When Plaintiff Hill responded that it should not matter either way, Meeks called Dispatcher Misty Thompson to ask her if Chad was black or white. The dispatcher indicated that Chad was black, and asked “is that a problem?”

82. Shocked that Meeks had called the dispatcher to inquire about an employees' race, and that Meeks may have screened other employees based on their race, Plaintiff Hill repeated the incident to Plaintiff Harvey.

83. In or around the summer of 2013, after witnessing Meeks' ongoing biased treatment of African Americans, and despite Plaintiff Harvey's fear that Kirby would penalize him for

complaining about Meeks, as they had penalized him for complaining about Captain Hindon, Plaintiff Harvey spoke to Kirby's dispatcher, Misty Thompson , and asked her whether it was normal for a captain to ask for the race of an employee hired onto a boat. Thompson indicated that she could not talk about the issue, but would convey Plaintiff's concerns to the District Manager.

84. Within a month of Plaintiff Harvey's complaint Kirby terminated his employment on the pretext that he had gotten into an argument with the Pilot Lewis LNU over Lewis' reckless boat-handling. Lewis had swerved suddenly and nearly capsized the *City of Louisville*, causing an engine fire and disrupting the towboat's connection to its barges. Both Lewis (who is Caucasian) and Harvey had gotten into a heated exchange over the boat's proper handling, but only Plaintiff Harvey was terminated.

85. Kirby terminated his employment on the pretext that he had gotten into an argument with the Pilot Lewis Newlon over Lewis' reckless boat-handling. Lewis had swerved suddenly and nearly capsized the *City of Louisville*, causing an engine fire and disrupting the towboat's connection to its barges. Both Lewis (who is Caucasian) and Harvey had gotten into a heated exchange over the boat's proper handling, but only Plaintiff Harvey was terminated.

86. Plaintiff Harvey was shocked when he learned that he would be fired over the exchange. It was obvious to Plaintiff that Kirby was retaliating against Plaintiff for complaining about Captain Meeks, given that the Pilot Lewis had been negligent in his driving, and it was not unusual for tension to run high within a crew in a life-threatening situation.

87. Following Plaintiff Harvey's separation from Kirby, Meeks made light of Plaintiff Harvey's complaint, stating to Plaintiff Hill that “I had a racial discrimination complaint filed

against me about red Kool Aid from Willie."

88. Despite Plaintiff Harvey's complaint against Meeks, Meeks continued to use racially offensive language.

89. In contemporaneous notes, which he submitted to Kirby's Human Resources Department, in July 2014, Plaintiff Cooper documented examples of Meeks' continuing race-based comments:

a. On February 13, 2014, Meeks commented, "if you have a party you can tell if the black guy had fun if the chicken is gone!"

b. On February 14, 2014, commented that the "President [is] black and shouldn't be in office."

c. On February 14, 2014, Bobby (a pilot) asked Meeks, did Meeks get him any chocolate for Valentine's Day and Meeks responded, "I got you Coop instead."

d. In Spring or Summer of 2014, Meeks commented about Chris Stoudemire, "Chris was black and he had black tattoos that he can't even see, he should've outlined them in white."

e. On March 18, 2014, Meeks commented in front of Andrew Loften and Amanda Everitt that he had once seen a black man as black as Cooper with blue eyes.

f. On May 16, 2014, when Plaintiff Cooper stated, "I have 99 problems but my wife isn't one," Meeks responded, "she could've been a bitch."

g. On June 20, 2014, Meeks related that he had sold 350 cars in eleven months to black women on welfare who spend their tax returns on cars.

90. Plaintiff Hill also heard Meeks' racial remarks regularly, including some of these and other similar remarks. Typical comments Hill overheard from Meeks included Meeks referring to Plaintiff Hill as "black ass," and remarking how a seemingly broken down 1982

Cadillac was a black man's car.

91. In early 2014, Plaintiff Hill held both the captain's mate and deckineer position on the *City of Louisville*.

92. As captain's mate, Plaintiff Hill was responsible for managing the non-managerial crew, including deckhands and tankerman.

93. As a deckineer, Plaintiff Hill worked in the engine room two weeks out of the month, alternating with his tankerman duties.

94. In addition to directing offensive racial comments at Plaintiff Hill, Meeks also sabotaged Plaintiff Hill's position as a mate. Often, Meeks gave orders to Plaintiff Hill to communicate to the crew, and then countermanded the orders. For example, Meeks would ask Plaintiff Hill to have the crew clean the ceilings of the boat, and then while the crew was in the midst of cleaning, Meeks would indicate to the crew that he had never given the orders, causing the crew to question Plaintiff Hill's leadership.

95. As a deckineer, Plaintiff Hill served as relief to the chief engineer, monitoring the engines when the chief engineer was not on duty. Meeks also attempted to regularly hinder Plaintiff Hill's opportunities to serve as deckineer; whenever the Engineer was off duty, Meeks would attempt to procure a replacement engineer, telling Plaintiff Hill that he did not have enough experience to be in charge of the boat's engine room. When the replacement engineer would arrive, however, the engineer would rely on Plaintiff Hill's advice to maintain the engine room, because he was unfamiliar with the boat.

96. After continuing to experience racial harassment and discrimination on an ongoing basis from Meeks, even despite Plaintiff Harvey's complaint, both Plaintiff Cooper and Plaintiff Hill

submitted transfer requests to Meeks.

97. Meeks ripped up both transfers and refused to forward them to Kirby's management.

98. As a last ditch effort to distance himself from Meeks' ongoing racial harassment, Plaintiff Hill resigned from his captain's mate position, accepting a pay-cut; he continued in his deckineer position. Plaintiff Hill hoped that the drastic measure would blunt the effects of Meeks' harassment. The captain's mate position had required Plaintiff Hill to work closely with Meeks, exposing him to Meeks' regular harassment while also isolating Plaintiff Hill from his fellow crew members because of Meeks' regular efforts to undermine the crews' trust in Hill's competence.

99. Even after Plaintiff's resignation from the mate position, Meeks persisted in attempting to sabotage Plaintiff Hill's relationship with the crew. For example, Meeks reported to Plaintiff Hill that two crew members were listening to a song on the radio, titled, "N*gger, N*gger, N*gger kill all the white people." Though Plaintiff Hill had never heard of a song with that title, and was skeptical that a radio station would play such an offensively titled song, he confronted the crew members. The crew members were appalled at Hill's questioning, upset that Hill would even imply that they could have been listening to a song with such an offensive title.

100. Under the pressure of ongoing racial harassment, Plaintiff Hill and Plaintiff Cooper again sought transfers from the *City of Louisville* in July 2014, while Meeks was off-duty from the boat.

101. Plaintiff Hill and Cooper also reported Meeks' continuing racial harassment to Tonya Callahan at Human Resources.

102. In his complaint Plaintiff Cooper reported:

> Captain Meeks has used verbal insults on a routine bases at work. His behavior has bothered many members of our boat,... One such incident occurred on March 18th when Captain Meeks said to me that he saw a black man who looks like me with blue eyes. On March 31st, Captain Meeks stopped me and said, "The boat was pretty dirty". I said "Yes" and he said, "A lot of black sh*t on it, almost as black as you". Yet another incident occurred on June 20th when Captain Meeks spoke about selling 350 cars in 11 months because "black women on welfare get their tax returns and spend it on cars". These are only a few of the many incidents that I have documented. Such remarks as these make me very uncomfortable to be around him, in a confined space and with him being my direct supervisor.

103. Plaintiff Hill submitted a separate complaint, also detailing the harassment Meeks had subjected him to on an ongoing basis.

104. Though Plaintiff Hill was approved for a transfer within two weeks of his request, Plaintiff Cooper was required to continue to serve under Captain Meeks for an additional two months.

105. Even while granting Plaintiff Hill a transfer, in a classic "blame the victim" response, Human Resources Representative Kenny Shavers accused Plaintiff Hill of failing to give Meeks "a fair chance."

106. Despite their complaints, and Harvey's before, Meeks continued in his Captain's position. On Plaintiff Hill's last day on the *City of Louisville,* Meeks even had the gall to taunt Hill that his transfer would take longer than expected.

107. Though Meeks continued to have a permanent assignment aboard the *City of Louisville*, Plaintiff Hill lost his permanent assignment and was not given a new one for approximately two years. He floated from boat to boat and was de facto demoted from deckineer to tankerman because of an alleged dearth in available deckineer positions on other boats.

108. Plaintiff Hill continued to be harassed on the other boats to which he was assigned. For

example, on the *Pebble Beach*, Keith Crawford, a Caucasian tankerman, referred to Plaintiff, the only African-American on the boat, as "boy." Crawford had never directed the derogatory term at other white crew members. Plaintiff reported the incident to Captain Wilson, but was never informed that Kirby was taking action in response.

109. Plaintiff Cooper, after two months of serving on the *City of Louisville* following Plaintiff Hill's transfer, was also transferred from the *City of Louisville*. Like Plaintiff Hill, he also floated from boat to boat without a permanent assignment.

110. Eventually, Plaintiff Cooper was assigned to the *Pass Christian*, where he experienced racial harassment and discrimination.

111. On the *Pass Christian*, Bill Wiley, the Chief Engineer, regularly used the term "boy" to refer to Plaintiff Cooper and his African American coworker, Jacorey Charles. For example, asking, "can I get you boys to get these oil bags off for me," stating "the Captain wants you boys to finish tasks that Captain assigned," and remarking "that boy sure can cook some chicken." He never directed the offensive term at white crew members.

112. The racial animosity on the boat was readily apparent. In or around March 2015, Captain Billingsley, Wiley, and Ashley Leiger were sitting in the wheelhouse talking. Captain Billingsley asked if anyone knew how to spell "bowline knot," and then proceeded to pull up pictures of a noose on his phone. Wiley laughed and said "I know how to make those. I make them at home."

113. Shocked at the conversation, Plaintiff Cooper left the wheelhouse. Wiley followed right behind him, retrieving a white rope and tying it into a noose, saying "this is how you do it."

114. On March 21, 2015, desperate to leave the hostile environment, Plaintiff submitted a transfer request to Kirby.

115. Though he called the company on multiple occasions to check on the status of his request, no one responded to his request, and Plaintiff continued to work on the *Pass Christian*.

116. Plaintiff continued to experience racial harassment and discrimination on the *Pass Christian*. Chief Engineer, Bill Wiley persisted in directing racially offensive remarks at Plaintiff Cooper.

117. Early in his placement on the *Pass Christian*, Plaintiff heard about an opening for deckineer on the boat, and conveyed his interest to Captain Billingsley and Engineer Bill Wiley.

118. Plaintiff was encouraged to inquire by his African American coworker, Deckineer Rodney Brooks, and was optimistic about his prospects for receiving training for the promotion.

119. Soon afterward, Jacorey Charles, an African-American tankerman, heard Captain Billingsley speaking with Captain Meeks on the phone about Plaintiff Cooper.

120. Shortly after Billingsley's conversation with Meeks, Wiley, the Chief Engineer who would have been responsible for training Plaintiff as a deckineer, stated to Brooks that "[he had] heard some things about Cooper and I ain't trying to show him anything down there [in the engine room]." Clearly, Meeks had reported Plaintiff's complaint to Billingsley and word had spread to Wiley who retaliated against Plaintiff for his complaint by denying him the opportunity to train as deckineer.

121. After his phone call with Meeks, Captain Billingsley also began singling out Plaintiff with more work than his Caucasian Tankerman counterpart, Ashley Leiger. Though Leiger and Plaintiff Cooper were officially required to split assignments on the daily task list, Billingsley assigned the bulk of the work to Plaintiff Cooper. Making light of his retaliatory conduct, Billingsley would openly remark to Leiger, "what are you planning to do today; actually, why am

I asking you, I know you're going to do nothing."

122. Billingsley also disciplined Plaintiff for baseless reasons. For example, Plaintiff was given a verbal, written and final warning for insubordination for waking up Engineer Wiley to turn on the engines rather than doing it himself, though turning on engines was outside Plaintiff's job duties, and he could have been disciplined had he done it himself.

123. He was also written up for touching the thermostat, though he explained to Captain Billingsley that he had not done so.

124. In or around June 2015, after hearing from multiple coworkers that Captain Billingsley was "gunning for him" to leave the boat, and also experiencing continued racial discrimination, harassment and retaliation from Billingsley, Plaintiff approached Captain Billingsley, asking him, "I sense there is some tension between us, what can I do to change that." Billingsley agreed that there was tension between them and suggested that Plaintiff transfer from the boat. Billingsley explained that the transfer would be expedited if Plaintiff stated that he would like to move to a bigger boat with clean product.

125. On June 17, 2015, Plaintiff submitted a request to transfer to a bigger boat with clean product.

126. He supplemented his request by explaining to the Port Captain, Kevin Rabalais, that Captain Billingsley had been upset with him and when "[Plaintiff Cooper spoke to Billingsley] about how to resolve the tension, [Billingsley] asked me to transfer."

127. For months, Plaintiff received no response on the transfer from Kirby. Plaintiff followed up multiple times by phone to inquire into the status of the transfer to no avail.

128. Finally, on September 9, 2015, Plaintiff was invited to meet with Rabalais, Billy

Thompson, a human resources representative, and Tonya Callahan, a human resources representative. At the meeting, the three dismissed Plaintiff's retaliation concerns, accused him of being dishonest because he had mentioned two separate reasons for requesting a transfer - that he wanted to move to a cleaner vessel and also that he was being harassed by the Captain - and reprimanded him for failing to turn on the engines, a task outside of his job duties.

129. Plaintiff returned to the *Pass Christian* deflated that Kirby's Human Resources Department made no effort to investigate his concerns, and in fact green-lit Billingsley's retaliation by endorsing Billingsley's baseless write ups.

130. Plaintiff continued to complain about his placement on the *Pass Christian.* On July 18, 2016, Plaintiff submitted another transfer request stating, " I, Aaron Cooper, knowing that I am not wanted on this vessel by Captain Toby and his picks, would like to request a transfer. I have been told this by several crew members. There have been situations in the past that caused me to be uneasy and I would rather not be in situations that could be avoided..."

131. Once again, Plaintiff heard nothing from Kirby about the transfer for an extended period of time.

132. On August 24, 2016, Plaintiff was finally invited to meet with Kirby representatives to discuss his transfer. At the meeting, he was interrogated by Lucas Holder, a newly assigned Port Captain, Tonya Callahan and Billy Thompson about the reasons for his transfer request. Plaintiff explained that he wanted to be transferred from the *Pass Christian* because of the ongoing racial discrimination, harassment and retaliation he was experiencing on the boat.

133. Instead of attempting to investigate the issue, Callahan's automatic response was to threaten Plaintiff Cooper that Kirby would not move Cooper again to a different boat after this

current transfer and that if he requested another move, he would be fired.

134. Plaintiff understood that he was being penalized for requesting a transfer because he had complained about racial discrimination and retaliation.

135. Unable to continue to work within Kirby's hostile work environment where human resources readily ignored race-based treatment and retaliated against complaints of race-based harassment, Plaintiff was constructively discharged on August 24, 2016.

136. In his separation letter, he stated: "I can no longer stay employed with Kirby due the repeated racial harassment, discrimination, and retaliation that I experienced on several of the vessels on which I worked, including M/V City of Louisville under Captain David Meeks and M/V Pass Christian under Captain Toby Billingsley. I previously complained of Captain David Meeks' racial harassment while I was on M/V Louisville. My next permanent assignment, M/V Pass Christian, brought more of the same, as I again experienced racial harassment and retaliation by Captain Toby Billingsley and Chief Engineer, Bill Wiley....I cannot...continue to be subjected to this racist treatment."

137. Throughout their time at Kirby, Plaintiffs Harvey, Hill and Cooper were subjected to racial harassment, discrimination and retaliation.

138. Plaintiffs Harvey, Hill and Cooper have suffered emotional distress as a result of the harassment, discrimination and retaliation.

## Count One

## Racially Hostile Work Environment and Discrimination In Violation of 42 U.S.C. 1981 Against Defendant Kirby Inland Marine, LP

139. Plaintiffs Cooper, Harvey and Hill incorporate by reference paragraphs 1 through 138.

140. Defendant Kirby Inland Marine, LP violated 42 USC 1981, by creating a hostile work environment on the basis of race, and by engaging in intentional discrimination, when inter alia it treated Plaintiffs differently from similarly situated employees outside their protected class in workload assignment, promotion, termination and other decisions.

141. As a consequence of Defendant's conduct, Plaintiffs suffered emotional distress, economic loss and other damages.

142. Defendant's actions proximately caused Plaintiffs' injuries.

**Count Two**

**Plaintiff Willie Harvey's Retaliation**
**In Violation of 42 U.S.C. 1981**
**Against Defendant Kirby Inland Marine, LP**

143. Plaintiffs incorporate by reference paragraphs 1 through 142.

144. Defendant engaged in illegal retaliation by, inter alia, penalizing Plaintiff Harvey for requesting transfers, disciplining Plaintiff Harvey more severely than other similarly situated employees, disciplining Plaintiff for conduct others were not disciplined for, terminating Plaintiff in response to his complaints of racial discrimination, and engaging in other adverse actions against Plaintiff for engaging in protected activity, and creating a hostile work environment for complaining about discrimination.

145. As a consequence of Defendant's conduct, Plaintiff Harvey suffered emotional distress, economic loss and other damages.

146. Defendant's actions proximately caused Plaintiff's injuries.

**Count Three**

**Plaintiff Orlando Hill's Retaliation**

**In Violation of 42 U.S.C. 1981**
**Against Defendant Kirby Inland Marine, LP**

147. Plaintiffs incorporate by reference paragraphs 1 through 146.

148. Defendant engaged in illegal retaliation by, inter alia, penalizing Plaintiff Hill for requesting transfers, interfering with his ability to perform his job duties as a mate, minimizing his opportunity to work as a deckineer, failing to give him a permanent assignment, failing to assign him to a position where he could continue to work as a deckineer, routinely changing his boat assignments, and engaging in other adverse actions against Plaintiff Hill for engaging in protected activity, and creating a hostile work environment for complaining about discrimination.

149. As a consequence of Defendant's conduct, Plaintiff Hill suffered emotional distress, economic loss and other damages..

150. Defendant's actions proximately caused Plaintiff's injuries.

**Count Four**

**Plaintiff Aaron Cooper's Retaliation**
**In Violation of 42 U.S.C. 1981**
**Against Defendant Kirby Inland Marine, LP**

151. Plaintiffs incorporate by reference paragraphs 1 through 150.

152. Defendant engaged in illegal retaliation by, inter alia, assigning Plaintiff Cooper to a greater workload than similarly situated employees, disciplining him more severely than similar situated employees, disciplining him for offenses not described in any written policy, disciplining Plaintiff for conduct others were not disciplined for, penalizing him for requesting transfers, failing to accommodate his transfer requests, threatening his job for requesting transfers, and engaging in other adverse actions against Plaintiff for engaging in protected activity, and creating

a hostile work environment for complaining about discrimination.

153. As a consequence of Defendant's conduct, Plaintiff Cooper suffered emotional distress, economic loss and other damages..

154. Defendant's actions proximately caused Plaintiff's injuries.

**Count Five**

**Plaintiff Aaron Cooper's Constructive Discharge**
**In Violation of 42 U.S.C. 1981**
**Against Defendant Kirby Inland Marine, LP**

155. Plaintiffs incorporate by reference paragraphs 1 through 154.

156. As a result of Defendant's conduct, Plaintiff Cooper was subjected to hostile and retaliatory working conditions that were so intolerable that he was forced to resign from his position.

157. As a consequence of Defendant's conduct, Plaintiff Cooper suffered severe emotional distress, economic loss and other damages.

158. Defendant's actions proximately caused Plaintiff Cooper's injuries.

**Count Six**

**Plaintiff Willie Harvey's Discriminatory Discharge**
**In Violation of 42 U.S.C. 1981**
**Against Defendant Kirby Inland Marine, LP**

159. Plaintiffs incorporate by reference paragraphs 1 through 158.

160. Defendant engaged in illegal discrimination when it discharged Plaintiff Harvey for, inter alia, conduct other Caucasian workers were not terminated for.

161. As a consequence of Defendant's conduct, Plaintiff Harvey suffered severe emotional distress, economic loss and other damages..

162. Defendant's actions proximately caused Plaintiff Harvey injuries.

## JURY DEMAND

163. Plaintiff herein demands a trial by jury for all issues in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

a. Judgment against Defendant for violations of 42 U.S.C. 1981;

b. Compensatory damages for emotional distress;

c. Compensatory damages in the form of lost wages;

d. Punitive damages;

e. An award of prejudgment interest;

f. All costs and attorneys' fees incurred prosecuting these claims; and

g. For such further relief as the Court deems just and equitable.

Dated: March 17, 2017

*/s/ J. Arthur Smith, III*
J. Arthur Smith, III
Bar No. 07730
Smith Law Firm, LLC
830 North St.
Baton Rouge, LA 70802
Telephone: 225-383-7716
Fax: 225-383-7773
E-mail: jasmith@jarthursmith.com

____/s/ Effat Hussain ______
Joshua Friedman
Rebecca Houlding
Effat Hussain
Friedman & Houlding, LLP

1050 Seven Oaks Lane
Mamaroneck, NY 10543
888-369-1119
Fax: 866-731-5553
josh@joshuafriedmanesq.com
rebecca@joshuafriedmanesq.com
*Pro Hac Vice Application Pending*